# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**UNITED STATES OF AMERICA**    :    CRIMINAL NO. 13 CR-58-RLW

                      :

           **v.**                 :

                      :

**JESSE L. JACKSON, JR.**         :

## STATEMENT OF THE OFFENSE

1.    Had this case proceeded to trial, the government would have shown beyond a reasonable doubt, the following facts:

### INTRODUCTION

2.    At all relevant times, the defendant, Jesse L. Jackson, Jr. ("Defendant"), served as a Congressman in the United States House of Representatives, representing Illinois's 2nd Congressional District. Defendant maintained a home in Chicago, Illinois, within the 2nd Congressional District, and a home near the Dupont Circle and Georgetown neighborhoods of Washington, D.C.

3.    From at least in or about 2008 to in or about November 2012, Co-Conspirator 1 served as a consultant to Defendant's re-election campaigns. Starting in 2011, Co-Conspirator 1 also started functioning as the campaign manager for the campaigns to re-elect Defendant. From in or about January 2005 to in or about November 2006, Co-Conspirator 1 served as treasurer of Defendant's re-election campaigns.

4.    At all relevant times, Person A took part in preparing the forms the Defendant's re-election campaigns filed with the Federal Election Commission ("FEC"). From in or about January 2005 through in or about November 2006, Person A was the assistant treasurer of Defendant's re-election campaigns and assisted Co-Conspirator 1 in preparing the FEC filings.

1

From in or about January 2007 through in or about June 2008, Person A officially served as the treasurer of Defendant's re-election campaigns. After June 2008, Person A ceased serving as treasurer of Defendant's re-election campaigns, but continued to assemble FEC filings for the signature of the new treasurer. From in or around June 2008 to the present, Person A was also a staff member for Defendant, working in his Washington, D.C., Congressional Office.

5.     Person B served as the treasurer of Defendant's re-election campaigns from in or about July 2008 through in or about July 2012 and signed the forms prepared by Person A.

6.     At all relevant times, Person C was a staff member for Defendant, working in his district office in the 2nd Congressional District.

7.     At all relevant times, Person D was president and chief operating officer of an Illinois-based company.

8.     At all relevant times, Person E was the owner of an Illinois-based consulting firm.

9.     At all relevant times, Person F was the owner of an Alabama-based company.

10.    Each candidate for federal office must form a principal campaign committee. Once designated, a principal campaign committee can establish and utilize bank accounts for the purpose of managing the finances of the campaign. At all relevant times, Defendant's principal campaign committee was "Jesse Jackson Jr for Congress"[1] ("the Campaign").

CONDUCT

11.    From in or about August 2005 through in or about April 2012, Defendant and Co-Conspirator 1 conspired to defraud the Campaign of approximately $750,000. Rather than using funds donated to the Campaign as they were intended to be used—to pay for the legitimate

---

[1]     On or about January 14, 2010, a comma and a period were added to the name of the principal campaign committee: "Jesse Jackson, Jr. for Congress." In all other respects, the name of the principal campaign committee remained the same.

expenses associated with Defendant's re-election—Defendant and Co-Conspirator 1 used a substantial portion of the contributed funds for personal expenditures. The Defendant and Co-Conspirator 1 obtained these funds in three different ways: a) Defendant made direct expenditures from his Campaign accounts for personal expenses; b) Defendant and Co-Conspirator 1 routinely used Campaign credit cards to make purchases for personal expenses and directed that Campaign funds be used to pay the credit card bills for those purchases; and c) Defendant provided Co-Conspirator 1 and Person A with Campaign funds so that they, in turn, could engage in transactions that personally benefitted Defendant and Co-Conspirator 1. Defendant and Co-Conspirator 1 used interstate carriers and interstate wires in furtherance of this fraudulent scheme.

12. Throughout the relevant period, Defendant solicited donors to contribute to the Campaign. Defendant never disclosed to potential donors that he had already used a substantial portion of the funds contributed to the Campaign for the personal benefit of him and Co-Conspirator 1, nor did he disclose that he intended to use a substantial portion of any new Campaign contributions for the personal benefit of him and Co-Conspirator 1.

13. As part of this conspiracy, Defendant and Co-Conspirator 1 took steps to ensure that, between in or about August 2005 and in or about July 2012, materially false and misleading reports were filed with government entities. First, Defendant and Co-Conspirator 1 directed that materially false and misleading reports be filed with the FEC. Campaigns are required to periodically file reports with the FEC reflecting contributions received and expenditures made during the reporting period. Federal law specifically prohibits campaigns from simply reporting as an expenditure the total amount spent on campaign credit cards. Instead, campaigns are responsible for reviewing credit card statements and itemizing—that is, individually reporting:

i) each expenditure that exceeds $200; and ii) all expenditures made to a particular vendor, if the combined expenditures with that vendor during an election cycle exceed $200. Defendant and Co-Conspirator 1, on numerous occasions, directed Person A not to itemize the personal expenditures made on the Campaign credit cards. On other occasions, Defendant and Co-Conspirator 1 knowingly and intentionally provided Person A with false justifications for the expenditures, causing Person A, in turn, to prepare false reports for submission to the FEC.

14. Second, Defendant filed materially false and misleading reports with the United States House of Representatives. As a Member of the United States House of Representatives, Defendant was required annually to file a United States House of Representatives Financial Disclosure Statement. This form called for Defendant to disclose all earned and unearned income that he received totaling $200 or more and gifts in the aggregate worth more than "minimal value"—a value to be determined on a periodic basis by the Administrator of General Services—from individuals other than relatives. Minimal value is currently defined as a retail value in the United States at the time of acceptance of $350 or less. Defendant failed to report any of the funds that he and Co-Conspirator 1 obtained by defrauding the Campaign. In addition, Defendant failed to report that he was the beneficiary of a number of undisclosed expenditures that third parties made on his and Co-Conspirator 1's behalf.

15. The materially false and misleading reports and forms filed with the FEC and the United States House of Representatives were an essential component of the conspiracy, as they enabled the conspiracy to continue without detection for a lengthy period of time and without the questions from regulators or the general public that likely would have ensued had truthful and accurate reports and forms been filed.

***Defendant's Direct Expenditures From His Campaign Account for Personal Expenses***

16.     In or about January 2006, Defendant personally opened an account at a national bank. The name on the account was "Jesse Jackson Jr. for Congress," and Defendant was the only person with signatory authority on the account.

17.     On or about July 10, 2007, Defendant withdrew $43,350.00 in Campaign funds from the account he created and used the funds to purchase an official check made payable to a jeweler to purchase a men's gold-plated Rolex watch from the jeweler.

18.     On or about July 9, 2007, the jeweler from whom Defendant purchased the Rolex watch shipped it from Chicago to Defendant's Washington, D.C., address, using an interstate shipper.

19.     From in or about September 2007 through in or about June 2011, Defendant used $14,442.83 in Campaign funds to pay down balances on personal credit cards maintained by Defendant or Co-Conspirator 1. The balances on these cards reflected expenditures made for personal, not Campaign, purposes. These payments occurred on the following dates in the following amounts:

- September 13, 2007: $2,000.00

- September 14, 2007: $2,457.16

- October 12, 2007: $4,355.49

- October 9, 2009: $1,640.25

- December 24, 2009: $1,271.16

- July 7, 2011: $2,718.77

***Defendant's Campaign Credit Card Expenditures for Personal Items***

20.    From at least August 2005 through April 2012, the Campaign maintained a credit card account entitled, "Jackson for Congress."  Individual credit card members on the account included Defendant and Co-Conspirator 1.

21.    For the period from in or about August 2005 through in our about April 2012, Defendant and Co-Conspirator 1 used the Campaign cards issued to them to purchase merchandise and services that were personal in nature.   These expenditures included high-end electronic items, collector's items, clothing, food and supplies for daily consumption, movie tickets, health club dues, personal travel, and personal dining expenses.   All of Co-Conspirator 1's expenditures occurred with Defendant's knowledge and consent, and, in many instances, Defendant personally benefited from Co-Conspirator 1's purchases.  Examples of such charges on the Campaign credit card include:

| Date | Description | Amount | Card Member |
|------|-------------|--------|-------------|
| 9/15/2005 | Ford – Sales/Service/Repair | $2,200.44 | Co-Conspirator 1 |
| 6/3/2006 | Navigator of The Sea – On Board Cruise Charges | $4,272.78 | Co-Conspirator 1 |
| 3/15/2007 | Walt Disney World – Transportation Services | $2,306.08 | Co-Conspirator 1 |
| 11/20/2007 | Best Buy | $9,554.75 | Defendant |
| 11/24/2007 | Best Buy | $1,102.81 | Defendant |
| 11/30/2007 | Best Buy | $320.18 | Defendant |
| 12/23/2007 | Build-a-Bear | $243.62 | Co-Conspirator 1 |
| 6/10/2008 | Antiquities of Nevada | $3,200.00 | Defendant |
| 6/11/2008 | Mandarin Oriental - CityZen | $466.30 | Defendant |
| 7/19/2008 | All Children's Furniture | $1,438.00 | Defendant |

| | | | |
|---|---|---|---|
| 7/24/2008 | Ticketmaster | $136.62 | Co-Conspirator 1 |
| 7/28/2008 | All Children's Furniture | $8,149.64 | Defendant |
| 8/2/2008 | ABT Electronics | $15,120.55 | Defendant |
| 8/14/2008 | Antiquities of Nevada | $8,650.00 | Defendant |
| 8/24/2008 | Mariel's Boutique | $3,544.00 | Co-Conspirator 1 |
| 9/23/2008 | Antiquities of Nevada | $5,595.00 | Defendant |
| 10/10/2008 | Ticketmaster | $299.00 | Co-Conspirator 1 |
| 11/27/2008 | Martha's Vineyard Holistic Retreat | $5,687.75 | Defendant |
| 12/3/2008 | Build-a-Bear | $70.27 | Defendant |
| 12/23/2008 | Costco | $287.47 | Co-Conspirator 1 |
| 2/12/2009 | Antiquities of Nevada | $5,150.00 | Defendant |
| 3/17/2009 | Little Lamb Scholastic | $3,627.00 | Co-Conspirator 1 |
| 7/1/2009 | Costco | $327.07 | Co-Conspirator 1 |
| 11/4/2009 | Antiquities of Nevada | $3,900.00 | Defendant |
| 11/14/2009 | Edward Lowell Furrier | $5,150.00 | Defendant |
| 2/8/2010 | Antiquities of Nevada | $2,245.00 | Defendant |
| 3/13/2010 | Antiquities of Nevada | $2,855.00 | Defendant |
| 6/13/2010 | Costco | $693.78 | Co-Conspirator 1 |
| 6/14/2010 | Costco | $600.00 | Co-Conspirator 1 |

22.　　Records from many of these merchants provide greater detail about the personal nature of the goods and services purchased with these Campaign funds:

- Records from Best Buy reveal that Defendant purchased multiple flat-screen televisions, multiple Blu-Ray DVD players, and numerous DVDs for his Washington, D.C., home;

- Records from Antiquities of Nevada reveal that Defendant purchased memorabilia related to Bruce Lee, Martin Luther King, Jr., Michael Jackson, Malcolm X, Jimmy

Hendrix, and American Presidents;

- Records from Mariel's Boutique reveal that Co-Conspirator 1 purchased dresses, jewelry, shoes, and accessories;

- Records from All Children's Furniture reveal that Defendant purchased children's bedroom furniture;

- Records from ABT Electronics reveal that Defendant and Co-Conspirator 1 purchased, among other items, a washer, a dryer, a range, and a refrigerator for their Chicago home; while Defendant's card was used to complete these transactions, Co-Conspirator 1 is listed on these records as the purchaser and the person to whom the items were to be shipped; Co-Conspirator 1's signature appears on the documents accepting delivery for a number of these items;

- Records from Mandarin Oriental's CityZen restaurant reflect that Defendant spent $466.30 on a dinner for two; this dinner was personal in nature;

- Records from Build-a-Bear reflect that Defendant and Co-Conspirator 1 purchased stuffed animals and accessories for stuffed animals;

- Records from Costco reveal that Co-Conspirator 1 purchased, among other items, video games, undergarments, cleaning supplies, toilet paper, toothpaste, soap, children's vitamins, and food;

- Records from Martha's Vineyard Holistic Retreat reveal that Defendant purchased a five-day health retreat for a family member of Co-Conspirator 1; and

- Records from Edward Lowell Furrier reveal that Co-Conspirator 1 purchased fur capes and parkas.

23.  A number of these items were shipped, using an interstate carrier, from outside

Washington, D.C., to Defendant's home in Washington, D.C., including:

- At least one of the items purchased at Antiquities of Nevada;

- The children's furniture from All Children's Furniture (shipped on July 25, 2008, from New Jersey and delivered on August 15, 2008); and

- The fur coats and parkas from Edward Lowell Furrier (shipped on November 16, 2009, from Beverly Hills, California).

24.  The examples provided in the table above are but a fraction of the personal

expenditures that Defendant and Co-Conspirator 1 made.  During the relevant period, Defendant

and Co-Conspirator 1 collectively made approximately 3100 purchases that were personal in nature. There are categories of expenditures into which a large number of these transactions can be placed. The categories, and the amounts associated with these categories, are as follows:

- Personal expenditures at restaurants, nightclubs, and lounges of approximately $60,857.04;

- Personal airfare expenditures of approximately $31,700.79;

- Personal expenditures at sports clubs and lounges of approximately $16,058.91 (including maintaining a family membership at a gym, purchasing food at the gym, and parking at the gym);

- Personal expenditures at tobacco shops of approximately $17,163.36;

- Personal expenditures for alcohol of approximately $5,814.43;

- Personal expenditures for dry cleaning of approximately $14,513.42;

- Personal expenditures at grocery stores of approximately $8,046.44; and

- Personal expenditures at drug stores of approximately $6,095.15.

25.     The approximately 3100 personal purchases made on the Campaign credit cards total approximately $582,772.58. In all instances, Campaign funds were used to pay the debt associated with these purchases.

### Defendant Directed Co-Conspirator 1 and Person A To Use Campaign Funds for His and Co-Conspirator 1's Benefit

*Co-Conspirator 1*

26.     On or about March 17, 2006, Defendant directed that a $36,000 check be issued to Co-Conspirator 1's business for billboard expenses.

27.     On or about March 24, 2006, Co-Conspirator 1 deposited the $36,000 check into an account controlled by Co-Conspirator 1's business.

28.     On or about March 31, 2006, Co-Conspirator 1 transferred the $36,000 from the business account to a personal account that Defendant and Co-Conspirator 1 controlled. Neither

Defendant nor Co-Conspirator 1 had spent personal funds on behalf of the Campaign, such that they were entitled to a $36,000 reimbursement.

29.    From on or about April 3, 2006, through on or about April 4, 2006, Defendant and Co-Conspirator 1 used nearly all of the $36,000 issued for billboard expenses to pay down personal debts.

*Person A*

30.    From in or about October 2008 through in or about March 2012, the Campaign issued approximately $76,150.39 in checks to Person A.  Although most of these payments were disclosed in FEC filings, some were not.  According to FEC filings by the Campaign, the disclosed payments to Person A were for clerical work, such as data entry, that Person A performed on behalf of the Campaign.  In truth and in fact, Person A was entitled to only approximately $11,409 for the work Person A performed on behalf of the Campaign.  Person A expended nearly all of the remainder of the funds received from the Campaign for Defendant and Co-Conspirator 1's benefit.  In all instances, Defendant determined: (i) which payments to Person A would be disclosed and which payments would not be disclosed; (ii) the amounts that Person A was to be paid; and (iii) the manner in which the excess funds paid to Person A would be spent.

31.    In addition to these payments, Person A received $19,000 in cash from Defendant.  Defendant has represented that this $19,000 in cash was given to him by family members.  Person A deposited these funds in Person A's account.  At Defendant's direction, Person A used the funds for the benefit of Defendant and Co-Conspirator 1.

32.     Person A wrote checks to Defendant using payments Person A received from the Campaign.  Person A, though, had not performed work that would have entitled Person A to the amounts reflected in these payments.  Instead, Defendant instructed Person A to write checks from the Campaign account in these amounts so that Person A could have sufficient funds to issue Defendant checks in the amounts that he desired.  The details of those transactions are as follows:

| Campaign to Person A (Posted Date) | Amount of Check | Person A to Defendant (Check Date) | Amount of Check |
| --- | --- | --- | --- |
| 10/14/2008 | $9,000[2] | 10/15/2008 | $6,500[3] |
| 3/4/2009 | $4,000 | 3/4/2009 | $3,500 |
| 8/1/2011 | $6,300 | 8/1/2011 | $4,000 |
| 3/22/2012 | $4,730.39[4] | 3/5/2012 | $1,700 |

33.     Each of the four checks from the Campaign was endorsed by Person A and deposited into Person A's account at a bank located within Washington, D.C.  By depositing these checks, Person A caused electronic communications to be sent from Washington, D.C., to

---

[2]     This $9,000 deposit is also referenced in Paragraph 36 because the remainder of this deposit was diverted for another unlawful expenditure.  An asterisk appears next to that deposit in the table in Paragraph 36.

[3]     The October 15, 2008 payment from Person A to Defendant was in cash.  All other payments from Person A to Defendant reflected in this table were by check.

[4]     This $4,730.39 deposit is also referenced in Paragraph 35 because almost all of the remainder of this deposit was diverted for another unlawful expenditure.  An asterisk appears next to that deposit in in the table in Paragraph 35.

Virginia, as these communications were a standard component of clearing a check at Person A's bank.

34.     Defendant deposited each of the payments he received from Person A into personal accounts he maintained for his personal use.

<u>Paying Down Personal Credit Card Balances</u>

35.     Between on or about January 18, 2011, and March 22, 2012, Person A issued six checks to pay down the balances on personal credit cards maintained by Defendant and Co-Conspirator 1. Each of these payments was preceded by a deposit into Person A's bank account that was equal in amount to, or greater than, the payment Person A made to pay down the personal credit card balances of Defendant and Co-Conspirator 1. The 2011 deposits were cash deposits. Person A received the cash for these deposits from Defendant. Defendant has represented that this cash was given to him by family members. The 2012 deposits were checks Person A received from the Campaign. Defendant instructed Person A to issue these Campaign checks to Person A and to use the funds from the checks to pay down the personal credit card balances of Defendant and Co-Conspirator 1. Person A had not performed work that would have entitled Person A to the amounts reflected in these payments. The details of the transactions are as follows:

| Date of Person A's Deposit | Amount | Date Person A Issued Check | Amount of Check | Defendant's Card Numbers |
|---|---|---|---|---|
| 1/18/2011 | $4,500 | 1/21/2011 | $4,500 | ***9009 |
| 3/9/2011 | $4,800 | 3/16/2011 | $4,800 | ***9009 |
| 4/13/2011 | $3,500 | 4/18/2011 | $3,500 | ***1000 |
| 7/26/2011 | $3,600 | 7/29/2011 | $3,600 | ***1000 |
| 2/16/2012 | $2,000 | 2/18/2012 | $2,000 | ***1000 |
| 3/22/2012 | $4,730.39* | 3/22/2012 | $2,810.91 | ***1000 |

Washington, D.C., Home Renovations

36.     From in or about October 2008 through in or about September 2011, Person A received numerous payments from the Campaign that Person A used to pay for work performed by several different contractors on Defendant's Washington, D.C., home. For each of these payments, Defendant instructed Person A to issue a Campaign check to Person A and to use the funds from the check to pay the contractors' bills. Person A had not performed work that would have entitled Person A to the amounts reflected in these payments. Each of these checks from the Campaign was endorsed by Person A and deposited into Person A's account at a bank located within Washington, D.C. By depositing these checks, Person A caused electronic communications to be sent from Washington, D.C., to Virginia, as these communications were a standard component of clearing checks at Person A's bank. The details of the transactions are as follows:

| Campaign to Person A (Post Date) | Amount of Check | Person A Check Date to Contractor | Amount of Check to Contractor |
|---|---|---|---|
| 10/6/2008 | $2,100 | 10/8/2008 | $2,085 |
| 10/14/2008 | $9,000 * | 10/14/2008 | $2,500 |
| 7/10/2009 | $3,500 | 7/10/2009 | $1,005 |
| -- | -- | 7/13/2009 | $1,700 |
| -- | -- | 7/22/2009 | $409.25 |
| 7/15/2009 | $1,150 | 7/14/2009 | $100 |
| -- | -- | 7/15/2009 | $1,050 |
| 1/11/2010 | $1,000 | 2/25/2010 | $220 |
| -- | -- | | $640 |
| 7/19/2011 | $2,500 | 7/12/2011 | $435.66 |
| -- | -- | 7/19/2011 | $1,900 |
| -- | -- | 7/21/2011 | $225 |
| -- | -- | 7/21/2011 | $275 |
| -- | -- | 7/25/2011 | $905.20 |
| 7/26/2011 | $2,900 | -- | -- |
| 8/1/2011 | $6,300 | -- | -- |
| 8/2/2011 | $6,100 | -- | -- |
| -- | -- | 8/1/2011 | $800.00 |
| -- | -- | 8/1/2011 | $1,850 |
| -- | -- | 8/2/2011 | $450 |
| -- | -- | 8/2/2011 | $1,100 |
| -- | -- | 8/5/2011 | $3,700 |
| -- | -- | 8/8/2011 | $857.65 |
| 8/30/2011 | $1,500 | 8/31/2011 | $3,000 |
| 9/20/2011 | $1,200 | 9/20/2011 | $1,139.58 |

Purchasing Elk Heads

37.     On or about March 11, 2011, Defendant exchanged emails with a taxidermist based in Montana about acquiring two mounted elk heads.

38.     From in or about March 2011 through in or about April 2011, Person A received funds and used those funds to purchase the elk heads on Defendant's behalf. The first deposit Person A received in connection with these transactions was cash provided to Person A by Defendant. Defendant has represented that the cash was given to him by family members. The other two deposits were checks that Person A received from the Campaign. Person A, though, had not performed work that would have entitled Person A to the amounts reflected in these two checks. Instead, Defendant instructed Person A to write checks in these amounts so that Person A could have sufficient funds to issue checks in the amounts that Defendant desired. The details of those transactions are as follows:

| Campaign to Person A (Posted Date) | Amount of Check | Memo for Check | Person A to Taxidermist (Check Date) | Amount of Check |
|---|---|---|---|---|
| 3/14/2011 | $3,005 | N/A [Cash] | 3/14/2011 | $3,000 (Cashier) $5 fee for cashier |
| 3/29/2011 | $3,500 | "for Data Reconciliation" | 4/1/2011 | $3,000 |
| 4/21/2011 | $1,500 | "for Data Entry & Cleanup" | 4/21/2011 | $1,053 |

39.     On or about March 14, 2011, Person A sent, via interstate carrier, the cashier's check from Defendant's Congressional Office to the taxidermist in Montana.

40.     On or about April 18, 2011, the taxidermist shipped the elk heads from Montana to Defendant's Congressional Office.

15

41.     On or about April 21, 2011, Person A sent, via interstate carrier, the final payment for the elk heads from Defendant's Congressional Office to the taxidermist in Montana.

42.     Both of the checks from the Campaign were endorsed by Person A and deposited into Person A's account at a bank located within Washington, D.C.  By depositing these checks, Person A caused electronic communications to be sent from Washington, D.C., to Virginia, as such communications were a standard component of clearing a check at Person A's bank.

43.     On or about July 23, 2012, Person A contacted the taxidermist, asking if the taxidermist knew someone who could purchase the elk heads or, in the alternative, someone who could build crates into which the elk heads could be placed for storage.

44.     On or about August 23, 2012, an undercover employee with the FBI ("UCE 1") called Person A, informing Person A that UCE 1 was an interior designer who had received Person A's name from the taxidermist and inquiring whether Person A had elk heads for sale.

45.     From on or about August 24, 2012, through on or about August 30, 2012, Person A completed the sale of Defendant's elk heads to UCE 1.  UCE 1 represented that UCE 1's client was willing to pay $5,300, which was less than the original price.  Person A agreed to the price and instructed UCE 1 to wire the funds for the elk heads to one of Defendant's personal accounts. UCE 1 wired the funds as instructed.  After wiring the funds, UCE 1 arranged to pick up the elk heads in Chicago, where they had been moved in early August 2012.

46.     Co-Conspirator 1, knowing that these elk heads had been purchased with Campaign funds, directed: that the elk heads be moved from Washington, D.C., to Chicago, Illinois; that Person A sell the elk heads; that Person A sell them for less than the amount for

which they were purchased; and that Person A instruct UCE 1 to wire the proceeds to Defendant's personal account.

### Defendant Was the Beneficiary of Undisclosed Transactions

*Person C*

#### Personal Credit Card Payment

47.     On or about September 8, 2009, Person C deposited $3,700 in cash into a checking account Person C maintained ("Chicago checking account"). Person C received this cash from Defendant. Defendant has represented that this cash was given to him by family members. Immediately after depositing the funds, Person C wrote a check in the amount of $2,000 to pay down the balance of a personal credit card maintained by Defendant and Co-Conspirator 1.

48.     On or about September 9, 2009, the credit card company credited the $2,000 to the account of Defendant and Co-Conspirator 1. Person C made this payment at Defendant's direction.

#### Memorabilia Purchase

49.     On or about October 13, 2009, Person C deposited $4,500 in cash into the Chicago checking account. Person C received this cash from Defendant, who has represented that this cash was given to him by family members.

50.     On or about November 12, 2009, Person C paid Antiquities of Nevada $4,000 using the debit card linked to the Chicago checking account.

51.     On or about November 13, 2009, Person C paid Antiquities of Nevada an additional $1,500, using the same debit card.

52.     Records from Antiquities of Nevada reflect that the $5,500 in payments from Person C was for a guitar used by Michael Jackson and Eddie Van Halen. The records further reflect that this guitar was shipped, via an interstate carrier, from Las Vegas, Nevada, to Defendant's Congressional Office in Washington, D.C. Person C made this purchase and shipped this item at Defendant's direction.

### School Payments

53.     On or about April 12, 2010, Person C deposited $6,400 in cash into the Chicago checking account. Person C received this cash from Defendant. After depositing the cash, Person C obtained two cashier's checks for $3,200 each. The payee on both checks was a private school located in Chicago. The "Purchased by" line on both checks stated that the checks were purchased by Co-Conspirator 1.

*Person D*

54.     Between on or about August 21, 2009, and September 3, 2009, Person D made five cash deposits into an account Person D maintained, totaling $15,000. Person D received this cash from Defendant. Defendant has represented that this cash was given to him by family members. Shortly after Person D started making these deposits, Person D began issuing checks to pay down balances on a credit card account maintained by Defendant and Co-Conspirator 1. Person D made these payments at Defendant's direction. The details of the payments are as follows:

- On or before August 26, 2009, Person D issued a check for $8,000 to pay down the balance of a personal credit card maintained by Defendant and Co-Conspirator 1.

- On or about August 26, 2009, the credit card company credited the $8,000 to the account of Defendant and Co-Conspirator 1.

- On or before September 11, 2009, Person D issued a check for $7,500 to pay down the balance of a personal credit card maintained by Defendant and Co-Conspirator 1.

- On or about September 11, 2009, the credit card company credited the $7,500 to the account of Defendant and Co-Conspirator 1.

- On or before October 1, 2009, Person D issued a check for $1,000 to pay down the balance of a personal credit card maintained by Defendant and Co-Conspirator 1.

- On or about October 1, 2009, the credit card company credited the $1,000 to the account of Defendant and Co-Conspirator 1.

*Person E*

55.     On or about May 5, 2009, Person E, at Defendant's direction, issued a check for $3,500 from a business account Person E controlled to a credit card company to pay down a balance on one of the personal credit cards of Defendant and Co-Conspirator 1.

56.     On or about May 13, 2009, the credit card company credited the $3,500 to the account of Defendant and Co-Conspirator 1.

*Person F*

57.     On or about April 25, 2011, Person F, at Defendant's direction, issued a check for $25,000 from a corporate account Person F controlled to pay down a balance on one of the personal credit cards of Defendant and Co-Conspirator 1.

58.     On or about April 30, 2011, the credit card company credited the $25,000 to the account of Defendant and Co-Conspirator 1.

### *Intentionally False and Misleading Filings*

*FEC*

59.     From in or about August 2005 through in or about July 2012, Defendant and Co-Conspirator 1 directed that materially false and misleading reports be filed with the FEC. Defendant and Co-Conspirator 1, on numerous occasions, directed Person A not to itemize the personal expenditures made on the Campaign credit cards, which resulted in the failure to report personal expenditures on the Campaign credit cards that should have been reported.  On other

19

occasions, Defendant and Co-Conspirator 1 knowingly and intentionally provided Person A with false and misleading justifications for their expenditures from Campaign funds, causing Person A, in turn, to prepare false and misleading reports for submission to the FEC. Co-Conspirator 1, Person A, and Person B then submitted the forms containing the materially false and misleading statements to the FEC. Examples of some of these false and misleading disclosures include:

- On or about May 29, 2008, Person A reported that the Campaign spent $1,553.08 on January 22, 2008, at a Chicago Museum for "room rental – fundraiser." In truth and in fact, Defendant spent these funds to purchase porcelain collector's items.

- On or about July 11, 2008, Person A reported that the Campaign spent $387.53 on May 27, 2008, at Home Depot for "Equp for Office Repairs." In truth and in fact, Defendant spent these funds to purchase grass seed and fertilizer for the lawn at his Chicago home.

- On or about January 23, 2009, Person B reported that the Campaign spent $224.89 on November 4, 2008, at a hotel restaurant for "FR Dinner Mtg." In truth and in fact, Defendant spent these funds to purchase lunch for him and his family.

- On or about January 23, 2009, Person B reported that the Campaign spent $387.04 on November 22, 2008, at Costco for "Food for Campaign Staff Holiday dinner." In truth and in fact, Co-Conspirator 1 spent these funds to purchase bath robes, a Christmas train, cleaning supplies, and food for Co-Conspirator 1's family's personal use.

*United States House of Representatives*

60. The financial disclosure statements Defendant submitted to the Office of the Clerk for the United States House of Representatives for calendar years 2007 (submitted May 15, 2008); 2008 (submitted May 15, 2009); 2009 (submitted May 17, 2010); 2010 (submitted May 13, 2011); and 2011 (submitted May 15, 2012) failed to reflect the payments and purchases that Person A, Person E, and Person F made on Defendant's behalf. Moreover, the reports do not reflect Campaign funds Defendant received and used for personal expenditures. These omissions were willfully and knowingly made by Defendant.

## CONCLUSION

61.     As a result of the conspiracy described above, Defendant willingly and knowingly used approximately $750,000 from the Campaign's accounts for personal expenses that benefitted Defendant and Co-Conspirator 1.


MATT GRAVES
MICHAEL ATKINSON
Bar No. DC - 481052 (Graves)
Bar No. DC - 430517 (Atkinson)
Assistant United States Attorneys
555 4th Street, N.W., 5th Floor
Washington, D.C.  20530

**Defendant's Acceptance**

I have read this Statement of the Offense and carefully reviewed every part of it with my attorneys. I am fully satisfied with the legal services provided by my attorney in connection with this Statement of the Offense and all matters relating to it. I fully understand this Statement of the Offense and voluntarily agree to it. No threats have been made to me, nor am I under the influence of anything that could impede my ability to understand this Statement of the Offense fully. No agreements, promises, understandings, or representations have been made with, to, or for me other than those set forth above.

2 – 20 – 13
_____
Date

_____
Jesse L. Jackson, Jr.


**Defense Counsel's Acknowledgment**

I am Jesse L. Jackson, Jr.'s attorney. I have reviewed every part of this Statement of the Offense with him. It accurately and completely sets forth the Statement of the Offense agreed to by the defendant and the Office of the United States Attorney for the District of Columbia.

2 – 20 – 13
_____
Date

_____
Reid H. Weingarten, Esq.

2 – 20 – 13
_____
Date

_____
Brian M. Heberlig, Esq.

22