## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 13-58 (ABJ)** |
| | : | |
| **v.** | : | |
| | : | |
| **JESSE L. JACKSON, JR.,** | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

### GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits its Memorandum in Aid of Sentencing. The United States recommends that this Court sentence the defendant, Jesse L. Jackson, Jr., to 48 months of incarceration, order $750,000 in restitution to the Campaign, impose a forfeiture money judgment in the amount of $750,000, and impose a three-year period of supervised release. In support thereof, the United States respectfully states the following.

### Background

At a plea hearing on February 20, 2013, Defendant admitted to the following facts:

1.     Had this case proceeded to trial, the government would have shown beyond a reasonable doubt, the following facts:

### INTRODUCTION

2.     At all relevant times, the defendant, Jesse L. Jackson, Jr. ("Defendant"), served as a Congressman in the United States House of Representatives, representing Illinois's 2nd Congressional District. Defendant maintained a home in Chicago, Illinois, within the 2nd

1

Congressional District, and a home near the Dupont Circle and Georgetown neighborhoods of Washington, D.C.

3.      From at least in or about 2008 to in or about November 2012, Co-Conspirator 1 served as a consultant to Defendant's re-election campaigns. Starting in 2011, Co-Conspirator 1 also started functioning as the campaign manager for the campaigns to re-elect Defendant. From in or about January 2005 to in or about November 2006, Co-Conspirator 1 served as treasurer of Defendant's re-election campaigns.

4.      At all relevant times, Person A took part in preparing the forms the Defendant's re-election campaigns filed with the Federal Election Commission ("FEC"). From in or about January 2005 through in or about November 2006, Person A was the assistant treasurer of Defendant's re-election campaigns and assisted Co-Conspirator 1 in preparing the FEC filings. From in or about January 2007 through in or about June 2008, Person A officially served as the treasurer of Defendant's re-election campaigns. After June 2008, Person A ceased serving as treasurer of Defendant's re-election campaigns, but continued to assemble FEC filings for the signature of the new treasurer. From in or around June 2008 to the present, Person A was also a staff member for Defendant, working in his Washington, D.C., Congressional Office.

5.      Person B served as the treasurer of Defendant's re-election campaigns from in or about July 2008 through in or about July 2012 and signed the forms prepared by Person A.

6.      At all relevant times, Person C was a staff member for Defendant, working in his district office in the 2nd Congressional District.

7.      At all relevant times, Person D was president and chief operating officer of an Illinois-based company.

8.      At all relevant times, Person E was the owner of an Illinois-based consulting firm.

2

9.    At all relevant times, Person F was the owner of an Alabama-based company.

10.    Each candidate for federal office must form a principal campaign committee. Once designated, a principal campaign committee can establish and utilize bank accounts for the purpose of managing the finances of the campaign. At all relevant times, Defendant's principal campaign committee was "Jesse Jackson Jr for Congress"[1] ("the Campaign").

CONDUCT

11.    From in or about August 2005 through in or about April 2012, Defendant and Co-Conspirator 1 conspired to defraud the Campaign of approximately $750,000. Rather than using funds donated to the Campaign as they were intended to be used—to pay for the legitimate expenses associated with Defendant's re-election—Defendant and Co-Conspirator 1 used a substantial portion of the contributed funds for personal expenditures. The Defendant and Co-Conspirator 1 obtained these funds in three different ways: a) Defendant made direct expenditures from his Campaign accounts for personal expenses; b) Defendant and Co-Conspirator 1 routinely used Campaign credit cards to make purchases for personal expenses and directed that Campaign funds be used to pay the credit card bills for those purchases; and c) Defendant provided Co-Conspirator 1 and Person A with Campaign funds so that they, in turn, could engage in transactions that personally benefitted Defendant and Co-Conspirator 1. Defendant and Co-Conspirator 1 used interstate carriers and interstate wires in furtherance of this fraudulent scheme.

---

[1]    On or about January 14, 2010, a comma and a period were added to the name of the principal campaign committee: "Jesse Jackson, Jr. for Congress." In all other respects, the name of the principal campaign committee remained the same.

12.     Throughout the relevant period, Defendant solicited donors to contribute to the Campaign. Defendant never disclosed to potential donors that he had already used a substantial portion of the funds contributed to the Campaign for the personal benefit of him and Co-Conspirator 1, nor did he disclose that he intended to use a substantial portion of any new Campaign contributions for the personal benefit of him and Co-Conspirator 1.

13.     As part of this conspiracy, Defendant and Co-Conspirator 1 took steps to ensure that, between in or about August 2005 and in or about July 2012, materially false and misleading reports were filed with government entities. First, Defendant and Co-Conspirator 1 directed that materially false and misleading reports be filed with the FEC. Campaigns are required to periodically file reports with the FEC reflecting contributions received and expenditures made during the reporting period. Federal law specifically prohibits campaigns from simply reporting as an expenditure the total amount spent on campaign credit cards. Instead, campaigns are responsible for reviewing credit card statements and itemizing—that is, individually reporting: i) each expenditure that exceeds $200; and ii) all expenditures made to a particular vendor, if the combined expenditures with that vendor during an election cycle exceed $200. Defendant and Co-Conspirator 1, on numerous occasions, directed Person A not to itemize the personal expenditures made on the Campaign credit cards. On other occasions, Defendant and Co-Conspirator 1 knowingly and intentionally provided Person A with false justifications for the expenditures, causing Person A, in turn, to prepare false reports for submission to the FEC.

14.     Second, Defendant filed materially false and misleading reports with the United States House of Representatives. As a Member of the United States House of Representatives, Defendant was required annually to file a United States House of Representatives Financial Disclosure Statement. This form called for Defendant to disclose all earned and unearned

4

income that he received totaling $200 or more and gifts in the aggregate worth more than "minimal value"—a value to be determined on a periodic basis by the Administrator of General Services—from individuals other than relatives.  Minimal value is currently defined as a retail value in the United States at the time of acceptance of $350 or less.  Defendant failed to report any of the funds that he and Co-Conspirator 1 obtained by defrauding the Campaign.  In addition, Defendant failed to report that he was the beneficiary of a number of undisclosed expenditures that third parties made on his and Co-Conspirator 1's behalf.

15.     The materially false and misleading reports and forms filed with the FEC and the United States House of Representatives were an essential component of the conspiracy, as they enabled the conspiracy to continue without detection for a lengthy period of time and without the questions from regulators or the general public that likely would have ensued had truthful and accurate reports and forms been filed.

### Defendant's Direct Expenditures From His Campaign Account for Personal Expenses

16.     In or about January 2006, Defendant personally opened an account at a national bank.  The name on the account was "Jesse Jackson Jr. for Congress," and Defendant was the only person with signatory authority on the account.

17.     On or about July 10, 2007, Defendant withdrew $43,350.00 in Campaign funds from the account he created and used the funds to purchase an official check made payable to a jeweler to purchase a men's gold-plated Rolex watch from the jeweler.

18.     On or about July 9, 2007, the jeweler from whom Defendant purchased the Rolex watch shipped it from Chicago to Defendant's Washington, D.C., address, using an interstate shipper.

19.     From in or about September 2007 through in or about June 2011, Defendant used

$14,442.83 in Campaign funds to pay down balances on personal credit cards maintained by

Defendant or Co-Conspirator 1.   The balances on these cards reflected expenditures made for

personal, not Campaign, purposes.   These payments occurred on the following dates in the

following amounts:

- September 13, 2007: $2,000.00

- September 14, 2007: $2,457.16

- October 12, 2007: $4,355.49

- October 9, 2009: $1,640.25

- December 24, 2009: $1,271.16

- July 7, 2011: $2,718.77

*Defendant's Campaign Credit Card Expenditures for Personal Items*

20.     From at least August 2005 through April 2012, the Campaign maintained a credit

card account entitled, "Jackson for Congress."   Individual credit card members on the account

included Defendant and Co-Conspirator 1.

21.     For the period from in or about August 2005 through in our about April 2012,

Defendant and Co-Conspirator 1 used the Campaign cards issued to them to purchase

merchandise and services that were personal in nature.   These expenditures included high-end

electronic items, collector's items, clothing, food and supplies for daily consumption, movie

tickets, health club dues, personal travel, and personal dining expenses.   All of Co-

Conspirator 1's expenditures occurred with Defendant's knowledge and consent, and, in many

instances, Defendant personally benefited from Co-Conspirator 1's purchases.  Examples of such

charges on the Campaign credit card include:

| Date | Description | Amount | Card Member |
|------|-------------|--------|-------------|
| 9/15/2005 | Ford – Sales/Service/Repair | $2,200.44 | Co-Conspirator 1 |
| 6/3/2006 | Navigator of The Sea – On Board Cruise Charges | $4,272.78 | Co-Conspirator 1 |
| 3/15/2007 | Walt Disney World – Transportation Services | $2,306.08 | Co-Conspirator 1 |
| 11/20/2007 | Best Buy | $9,554.75 | Defendant |
| 11/24/2007 | Best Buy | $1,102.81 | Defendant |
| 11/30/2007 | Best Buy | $320.18 | Defendant |
| 12/23/2007 | Build-a-Bear | $243.62 | Co-Conspirator 1 |
| 6/10/2008 | Antiquities of Nevada | $3,200.00 | Defendant |
| 6/11/2008 | Mandarin Oriental - CityZen | $466.30 | Defendant |
| 7/19/2008 | All Children's Furniture | $1,438.00 | Defendant |
| 7/24/2008 | Ticketmaster | $136.62 | Co-Conspirator 1 |
| 7/28/2008 | All Children's Furniture | $8,149.64 | Defendant |
| 8/2/2008 | ABT Electronics | $15,120.55 | Defendant |
| 8/14/2008 | Antiquities of Nevada | $8,650.00 | Defendant |
| 8/24/2008 | Mariel's Boutique | $3,544.00 | Co-Conspirator 1 |
| 9/23/2008 | Antiquities of Nevada | $5,595.00 | Defendant |
| 10/10/2008 | Ticketmaster | $299.00 | Co-Conspirator 1 |
| 11/27/2008 | Martha's Vineyard Holistic Retreat | $5,687.75 | Defendant |
| 12/3/2008 | Build-a-Bear | $70.27 | Defendant |
| 12/23/2008 | Costco | $287.47 | Co-Conspirator 1 |
| 2/12/2009 | Antiquities of Nevada | $5,150.00 | Defendant |
| 3/17/2009 | Little Lamb Scholastic | $3,627.00 | Co-Conspirator 1 |
| 7/1/2009 | Costco | $327.07 | Co-Conspirator 1 |

| 11/4/2009 | Antiquities of Nevada | $3,900.00 | Defendant |
|---|---|---|---|
| 11/14/2009 | Edward Lowell Furrier | $5,150.00 | Defendant |
| 2/8/2010 | Antiquities of Nevada | $2,245.00 | Defendant |
| 3/13/2010 | Antiquities of Nevada | $2,855.00 | Defendant |
| 6/13/2010 | Costco | $693.78 | Co-Conspirator 1 |
| 6/14/2010 | Costco | $600.00 | Co-Conspirator 1 |

22.     Records from many of these merchants provide greater detail about the personal nature of the goods and services purchased with these Campaign funds:

- Records from Best Buy reveal that Defendant purchased multiple flat-screen televisions, multiple Blu-Ray DVD players, and numerous DVDs for his Washington, D.C., home;

- Records from Antiquities of Nevada reveal that Defendant purchased memorabilia related to Bruce Lee, Martin Luther King, Jr., Michael Jackson, Malcolm X, Jimmy Hendrix, and American Presidents;

- Records from Mariel's Boutique reveal that Co-Conspirator 1 purchased dresses, jewelry, shoes, and accessories;

- Records from All Children's Furniture reveal that Defendant purchased children's bedroom furniture;

- Records from ABT Electronics reveal that Defendant and Co-Conspirator 1 purchased, among other items, a washer, a dryer, a range, and a refrigerator for their Chicago home; while Defendant's card was used to complete these transactions, Co-Conspirator 1 is listed on these records as the purchaser and the person to whom the items were to be shipped; Co-Conspirator 1's signature appears on the documents accepting delivery for a number of these items;

- Records from Mandarin Oriental's CityZen restaurant reflect that Defendant spent $466.30 on a dinner for two; this dinner was personal in nature;

- Records from Build-a-Bear reflect that Defendant and Co-Conspirator 1 purchased stuffed animals and accessories for stuffed animals;

8

- Records from Costco reveal that Co-Conspirator 1 purchased, among other items, video games, undergarments, cleaning supplies, toilet paper, toothpaste, soap, children's vitamins, and food;

- Records from Martha's Vineyard Holistic Retreat reveal that Defendant purchased a five-day health retreat for a family member of Co-Conspirator 1; and

- Records from Edward Lowell Furrier reveal that Co-Conspirator 1 purchased fur capes and parkas.

23.    A number of these items were shipped, using an interstate carrier, from outside Washington, D.C., to Defendant's home in Washington, D.C., including:

- At least one of the items purchased at Antiquities of Nevada;

- The children's furniture from All Children's Furniture (shipped on July 25, 2008, from New Jersey and delivered on August 15, 2008); and

- The fur coats and parkas from Edward Lowell Furrier (shipped on November 16, 2009, from Beverly Hills, California).

24.    The examples provided in the table above are but a fraction of the personal expenditures that Defendant and Co-Conspirator 1 made. During the relevant period, Defendant and Co-Conspirator 1 collectively made approximately 3100 purchases that were personal in nature. There are categories of expenditures into which a large number of these transactions can be placed. The categories, and the amounts associated with these categories, are as follows:

- Personal expenditures at restaurants, nightclubs, and lounges of approximately $60,857.04;

- Personal airfare expenditures of approximately $31,700.79;

- Personal expenditures at sports clubs and lounges of approximately $16,058.91 (including maintaining a family membership at a gym, purchasing food at the gym, and parking at the gym);

- Personal expenditures at tobacco shops of approximately $17,163.36;

- Personal expenditures for alcohol of approximately $5,814.43;

- Personal expenditures for dry cleaning of approximately $14,513.42;

- Personal expenditures at grocery stores of approximately $8,046.44; and

- Personal expenditures at drug stores of approximately $6,095.15.

25.     The approximately 3100 personal purchases made on the Campaign credit cards total approximately $582,772.58.  In all instances, Campaign funds were used to pay the debt associated with these purchases.

### Defendant Directed Co-Conspirator 1 and Person A To Use Campaign Funds for His and Co-Conspirator 1's Benefit

*Co-Conspirator 1*

26.     On or about March 17, 2006, Defendant directed that a $36,000 check be issued to Co-Conspirator 1's business for billboard expenses.

27.     On or about March 24, 2006, Co-Conspirator 1 deposited the $36,000 check into an account controlled by Co-Conspirator 1's business.

28.     On or about March 31, 2006, Co-Conspirator 1 transferred the $36,000 from the business account to a personal account that Defendant and Co-Conspirator 1 controlled.  Neither Defendant nor Co-Conspirator 1 had spent personal funds on behalf of the Campaign, such that they were entitled to a $36,000 reimbursement.

29.     From on or about April 3, 2006, through on or about April 4, 2006, Defendant and Co-Conspirator 1 used nearly all of the $36,000 issued for billboard expenses to pay down personal debts.

*Person A*

30.     From in or about October 2008 through in or about March 2012, the Campaign issued approximately $76,150.39 in checks to Person A.  Although most of these payments were

disclosed in FEC filings, some were not. According to FEC filings by the Campaign, the disclosed payments to Person A were for clerical work, such as data entry, that Person A performed on behalf of the Campaign. In truth and in fact, Person A was entitled to only approximately $11,409 for the work Person A performed on behalf of the Campaign. Person A expended nearly all of the remainder of the funds received from the Campaign for Defendant and Co-Conspirator 1's benefit. In all instances, Defendant determined: (i) which payments to Person A would be disclosed and which payments would not be disclosed; (ii) the amounts that Person A was to be paid; and (iii) the manner in which the excess funds paid to Person A would be spent.

31. In addition to these payments, Person A received $19,000 in cash from Defendant. Defendant has represented that this $19,000 in cash was given to him by family members. Person A deposited these funds in Person A's account. At Defendant's direction, Person A used the funds for the benefit of Defendant and Co-Conspirator 1.

### Conduit Payments

32. Person A wrote checks to Defendant using payments Person A received from the Campaign. Person A, though, had not performed work that would have entitled Person A to the amounts reflected in these payments. Instead, Defendant instructed Person A to write checks from the Campaign account in these amounts so that Person A could have sufficient funds to issue Defendant checks in the amounts that he desired. The details of those transactions are as follows:

11

| Campaign to Person A (Posted Date) | Amount of Check | Person A to Defendant (Check Date) | Amount of Check |
|---|---|---|---|
| 10/14/2008 | $9,000[2] | 10/15/2008 | $6,500[3] |
| 3/4/2009 | $4,000 | 3/4/2009 | $3,500 |
| 8/1/2011 | $6,300 | 8/1/2011 | $4,000 |
| 3/22/2012 | $4,730.39[4] | 3/5/2012 | $1,700 |

33.     Each of the four checks from the Campaign was endorsed by Person A and deposited into Person A's account at a bank located within Washington, D.C.  By depositing these checks, Person A caused electronic communications to be sent from Washington, D.C., to Virginia, as these communications were a standard component of clearing a check at Person A's bank.

34.     Defendant deposited each of the payments he received from Person A into personal accounts he maintained for his personal use.

---

[2]     This $9,000 deposit is also referenced in Paragraph 36 because the remainder of this deposit was diverted for another unlawful expenditure.  An asterisk appears next to that deposit in the table in Paragraph 36.

[3]     The October 15, 2008 payment from Person A to Defendant was in cash.  All other payments from Person A to Defendant reflected in this table were by check.

[4]     This $4,730.39 deposit is also referenced in Paragraph 35 because almost all of the remainder of this deposit was diverted for another unlawful expenditure.  An asterisk appears next to that deposit in in the table in Paragraph 35.

Paying Down Personal Credit Card Balances

35.     Between on or about January 18, 2011, and March 22, 2012, Person A issued six
checks to pay down the balances on personal credit cards maintained by Defendant and Co-
Conspirator 1. Each of these payments was preceded by a deposit into Person A's bank account
that was equal in amount to, or greater than, the payment Person A made to pay down the
personal credit card balances of Defendant and Co-Conspirator 1. The 2011 deposits were cash
deposits. Person A received the cash for these deposits from Defendant. Defendant has
represented that this cash was given to him by family members. The 2012 deposits were checks
Person A received from the Campaign. Defendant instructed Person A to issue these Campaign
checks to Person A and to use the funds from the checks to pay down the personal credit card
balances of Defendant and Co-Conspirator 1. Person A had not performed work that would have
entitled Person A to the amounts reflected in these payments. The details of the transactions are
as follows:

| Date of Person A's Deposit | Amount | Date Person A Issued Check | Amount of Check | Defendant's Card Numbers |
|---|---|---|---|---|
| 1/18/2011 | $4,500 | 1/21/2011 | $4,500 | ***9009 |
| 3/9/2011 | $4,800 | 3/16/2011 | $4,800 | ***9009 |
| 4/13/2011 | $3,500 | 4/18/2011 | $3,500 | ***1000 |
| 7/26/2011 | $3,600 | 7/29/2011 | $3,600 | ***1000 |
| 2/16/2012 | $2,000 | 2/18/2012 | $2,000 | ***1000 |
| 3/22/2012 | $4,730.39* | 3/22/2012 | $2,810.91 | ***1000 |

Washington, D.C., Home Renovations

36.     From in or about October 2008 through in or about September 2011, Person A received numerous payments from the Campaign that Person A used to pay for work performed by several different contractors on Defendant's Washington, D.C., home.  For each of these payments, Defendant instructed Person A to issue a Campaign check to Person A and to use the funds from the check to pay the contractors' bills. Person A had not performed work that would have entitled Person A to the amounts reflected in these payments.  Each of these checks from the Campaign was endorsed by Person A and deposited into Person A's account at a bank located within Washington, D.C. By depositing these checks, Person A caused electronic communications to be sent from Washington, D.C., to Virginia, as these communications were a standard component of clearing checks at Person A's bank.  The details of the transactions are as follows:

| Campaign to Person A (Post Date) | Amount of Check | Person A Check Date to Contractor | Amount of Check to Contractor |
|---|---|---|---|
| 10/6/2008 | $2,100 | 10/8/2008 | $2,085 |
| 10/14/2008 | $9,000 * | 10/14/2008 | $2,500 |
| 7/10/2009 | $3,500 | 7/10/2009 | $1,005 |
| -- | -- | 7/13/2009 | $1,700 |
| -- | -- | 7/22/2009 | $409.25 |
| 7/15/2009 | $1,150 | 7/14/2009 | $100 |
| -- | -- | 7/15/2009 | $1,050 |
| 1/11/2010 | $1,000 | 2/25/2010 | $220 |
| -- | -- | | $640 |
| 7/19/2011 | $2,500 | 7/12/2011 | $435.66 |
| -- | -- | 7/19/2011 | $1,900 |
| -- | -- | 7/21/2011 | $225 |
| -- | -- | 7/21/2011 | $275 |
| -- | -- | 7/25/2011 | $905.20 |
| 7/26/2011 | $2,900 | -- | -- |
| 8/1/2011 | $6,300 | -- | -- |
| 8/2/2011 | $6,100 | -- | -- |
| -- | -- | 8/1/2011 | $800.00 |
| -- | -- | 8/1/2011 | $1,850 |
| -- | -- | 8/2/2011 | $450 |
| -- | -- | 8/2/2011 | $1,100 |
| -- | -- | 8/5/2011 | $3,700 |
| -- | -- | 8/8/2011 | $857.65 |
| 8/30/2011 | $1,500 | 8/31/2011 | $3,000 |
| 9/20/2011 | $1,200 | 9/20/2011 | $1,139.58 |

Purchasing Elk Heads

37.     On or about March 11, 2011, Defendant exchanged emails with a taxidermist based in Montana about acquiring two mounted elk heads.

38.     From in or about March 2011 through in or about April 2011, Person A received funds and used those funds to purchase the elk heads on Defendant's behalf. The first deposit Person A received in connection with these transactions was cash provided to Person A by Defendant. Defendant has represented that the cash was given to him by family members. The other two deposits were checks that Person A received from the Campaign. Person A, though, had not performed work that would have entitled Person A to the amounts reflected in these two checks. Instead, Defendant instructed Person A to write checks in these amounts so that Person A could have sufficient funds to issue checks in the amounts that Defendant desired. The details of those transactions are as follows:

| Campaign to Person A (Posted Date) | Amount of Check | Memo for Check | Person A to Taxidermist (Check Date) | Amount of Check |
|---|---|---|---|---|
| 3/14/2011 | $3,005 | N/A [Cash] | 3/14/2011 | $3,000 (Cashier) $5 fee for cashier |
| 3/29/2011 | $3,500 | "for Data Reconciliation" | 4/1/2011 | $3,000 |
| 4/21/2011 | $1,500 | "for Data Entry & Cleanup" | 4/21/2011 | $1,053 |

39.     On or about March 14, 2011, Person A sent, via interstate carrier, the cashier's check from Defendant's Congressional Office to the taxidermist in Montana.

40.     On or about April 18, 2011, the taxidermist shipped the elk heads from Montana to Defendant's Congressional Office.

41.     On or about April 21, 2011, Person A sent, via interstate carrier, the final payment for the elk heads from Defendant's Congressional Office to the taxidermist in Montana.

42.     Both of the checks from the Campaign were endorsed by Person A and deposited into Person A's account at a bank located within Washington, D.C.  By depositing these checks, Person A caused electronic communications to be sent from Washington, D.C., to Virginia, as such communications were a standard component of clearing a check at Person A's bank.

43.     On or about July 23, 2012, Person A contacted the taxidermist, asking if the taxidermist knew someone who could purchase the elk heads or, in the alternative, someone who could build crates into which the elk heads could be placed for storage.

44.     On or about August 23, 2012, an undercover employee with the FBI ("UCE 1") called Person A, informing Person A that UCE 1 was an interior designer who had received Person A's name from the taxidermist and inquiring whether Person A had elk heads for sale.

45.     From on or about August 24, 2012, through on or about August 30, 2012, Person A completed the sale of Defendant's elk heads to UCE 1.  UCE 1 represented that UCE 1's client was willing to pay $5,300, which was less than the original price.  Person A agreed to the price and instructed UCE 1 to wire the funds for the elk heads to one of Defendant's personal accounts.  UCE 1 wired the funds as instructed.  After wiring the funds, UCE 1 arranged to pick up the elk heads in Chicago, where they had been moved in early August 2012.

46.     Co-Conspirator 1, knowing that these elk heads had been purchased with Campaign funds, directed: that the elk heads be moved from Washington, D.C., to Chicago, Illinois; that Person A sell the elk heads; that Person A sell them for less than the amount for

17

which they were purchased; and that Person A instruct UCE 1 to wire the proceeds to Defendant's personal account.

### Defendant Was the Beneficiary of Undisclosed Transactions

*Person C*

#### Personal Credit Card Payment

47.     On or about September 8, 2009, Person C deposited $3,700 in cash into a checking account Person C maintained ("Chicago checking account"). Person C received this cash from Defendant. Defendant has represented that this cash was given to him by family members. Immediately after depositing the funds, Person C wrote a check in the amount of $2,000 to pay down the balance of a personal credit card maintained by Defendant and Co-Conspirator 1.

48.     On or about September 9, 2009, the credit card company credited the $2,000 to the account of Defendant and Co-Conspirator 1. Person C made this payment at Defendant's direction.

#### Memorabilia Purchase

49.     On or about October 13, 2009, Person C deposited $4,500 in cash into the Chicago checking account. Person C received this cash from Defendant, who has represented that this cash was given to him by family members.

50.     On or about November 12, 2009, Person C paid Antiquities of Nevada $4,000 using the debit card linked to the Chicago checking account.

51.     On or about November 13, 2009, Person C paid Antiquities of Nevada an additional $1,500, using the same debit card.

52.     Records from Antiquities of Nevada reflect that the $5,500 in payments from Person C was for a guitar used by Michael Jackson and Eddie Van Halen. The records further reflect that this guitar was shipped, via an interstate carrier, from Las Vegas, Nevada, to Defendant's Congressional Office in Washington, D.C.  Person C made this purchase and shipped this item at Defendant's direction.

### School Payments

53.     On or about April 12, 2010, Person C deposited $6,400 in cash into the Chicago checking account.  Person C received this cash from Defendant.  After depositing the cash, Person C obtained two cashier's checks for $3,200 each.  The payee on both checks was a private school located in Chicago. The "Purchased by" line on both checks stated that the checks were purchased by Co-Conspirator 1.

*Person D*

54.     Between on or about August 21, 2009, and September 3, 2009, Person D made five cash deposits into an account Person D maintained, totaling $15,000.  Person D received this cash from Defendant.  Defendant has represented that this cash was given to him by family members.  Shortly after Person D started making these deposits, Person D began issuing checks to pay down balances on a credit card account maintained by Defendant and Co-Conspirator 1. Person D made these payments at Defendant's direction.  The details of the payments are as follows:

- On or before August 26, 2009, Person D issued a check for $8,000 to pay down the balance of a personal credit card maintained by Defendant and Co-Conspirator 1.

- On or about August 26, 2009, the credit card company credited the $8,000 to the account of Defendant and Co-Conspirator 1.

19

- On or before September 11, 2009, Person D issued a check for $7,500 to pay down the balance of a personal credit card maintained by Defendant and Co-Conspirator 1.

- On or about September 11, 2009, the credit card company credited the $7,500 to the account of Defendant and Co-Conspirator 1.

- On or before October 1, 2009, Person D issued a check for $1,000 to pay down the balance of a personal credit card maintained by Defendant and Co-Conspirator 1.

- On or about October 1, 2009, the credit card company credited the $1,000 to the account of Defendant and Co-Conspirator 1.

*Person E*

55.     On or about May 5, 2009, Person E, at Defendant's direction, issued a check for $3,500 from a business account Person E controlled to a credit card company to pay down a balance on one of the personal credit cards of Defendant and Co-Conspirator 1.

56.     On or about May 13, 2009, the credit card company credited the $3,500 to the account of Defendant and Co-Conspirator 1.

*Person F*

57.     On or about April 25, 2011, Person F, at Defendant's direction, issued a check for $25,000 from a corporate account Person F controlled to pay down a balance on one of the personal credit cards of Defendant and Co-Conspirator 1.

58.     On or about April 30, 2011, the credit card company credited the $25,000 to the account of Defendant and Co-Conspirator 1.

### *Intentionally False and Misleading Filings*

*FEC*

59.     From in or about August 2005 through in or about July 2012, Defendant and Co-Conspirator 1 directed that materially false and misleading reports be filed with the FEC. Defendant and Co-Conspirator 1, on numerous occasions, directed Person A not to itemize the

personal expenditures made on the Campaign credit cards, which resulted in the failure to report personal expenditures on the Campaign credit cards that should have been reported. On other occasions, Defendant and Co-Conspirator 1 knowingly and intentionally provided Person A with false and misleading justifications for their expenditures from Campaign funds, causing Person A, in turn, to prepare false and misleading reports for submission to the FEC. Co-Conspirator 1, Person A, and Person B then submitted the forms containing the materially false and misleading statements to the FEC. Examples of some of these false and misleading disclosures include:

- On or about May 29, 2008, Person A reported that the Campaign spent $1,553.08 on January 22, 2008, at a Chicago Museum for "room rental – fundraiser." In truth and in fact, Defendant spent these funds to purchase porcelain collector's items.

- On or about July 11, 2008, Person A reported that the Campaign spent $387.53 on May 27, 2008, at Home Depot for "Equp for Office Repairs." In truth and in fact, Defendant spent these funds to purchase grass seed and fertilizer for the lawn at his Chicago home.

- On or about January 23, 2009, Person B reported that the Campaign spent $224.89 on November 4, 2008, at a hotel restaurant for "FR Dinner Mtg." In truth and in fact, Defendant spent these funds to purchase lunch for him and his family.

- On or about January 23, 2009, Person B reported that the Campaign spent $387.04 on November 22, 2008, at Costco for "Food for Campaign Staff Holiday dinner." In truth and in fact, Co-Conspirator 1 spent these funds to purchase bath robes, a Christmas train, cleaning supplies, and food for Co-Conspirator 1's family's personal use.

*United States House of Representatives*

60.     The financial disclosure statements Defendant submitted to the Office of the Clerk for the United States House of Representatives for calendar years 2007 (submitted May 15, 2008); 2008 (submitted May 15, 2009); 2009 (submitted May 17, 2010); 2010 (submitted May 13, 2011); and 2011 (submitted May 15, 2012) failed to reflect the payments and purchases

that Person A, Person E, and Person F made on Defendant's behalf.  Moreover, the reports do not reflect Campaign funds Defendant received and used for personal expenditures.  These omissions were willfully and knowingly made by Defendant.

### Statutory Penalties

Defendant faces a maximum sentence of 5 years of imprisonment; a fine of up to $250,000; a term of supervised release of up to three years; and a $100 special assessment. PSR ¶¶ 131, 141, 150, 151 (citing relevant statutory sections).

### Sentencing Guidelines

The Federal Sentencing Guidelines calculation in the Draft Presentence Investigation Report ("Draft PSR") places Defendant's total offense level at 21.  PSR ¶ 79.  The PSR calculates Defendant's criminal history in Category I (0 point). PSR ¶ 83. The Guideline range for a total offense level of 21 with a criminal history of Category I is 37 to 46 months of imprisonment. PSR ¶ 132. The Guidelines recommend a period of supervised release of one to three years for a defendant convicted of 18 U.S.C. § 371. PSR ¶ 142.

The parties stipulated that Defendant's total offense level is 23.  With a total offense level of 23 and a criminal history of Category I, the parties agreed that the applicable Guideline range is 46 to 57 months.  The difference between the Draft PSR's Guideline range and the parties' stipulated Guideline range is that the parties stipulated that a two-point adjustment was proper under §2B1.1(b)(9)(A) and the Draft PSR does not apply the adjustment.[5]  The plain language of §2B1.1(b)(9)(A), the Application Note for the Guideline, and applicable case law make clear that §2B1.1(b)(9)(A) applies.

---

[5]     Other than acknowledging that the parties stipulated to "a two-level increase for misrepresentation (political)," *see* PSR ¶¶ 8, 133, the Draft PSR makes no mention of this enhancement.

Section 2B1.1(b)(9)(A) provides that "[i]f the offense involved (A) a misrepresentation that the defendant was acting on behalf of a charitable, educational, religious, or political organization, or a government agency . . . increase by 2 levels." The language is both absolute and clear and little need for clarification exists. Nevertheless, the Application Notes provide additional detail, stating that "[s]ubsection (b)(9)(A) applies in *any* case in which the defendant represented that the defendant was acting to obtain a benefit on behalf of a . . . political organization . . . when, in fact, the defendant intended to divert all *or part* of that benefit (*e.g.*, for the defendant's personal gain)." §2B1.1(b)(9)(A), Application Note 7(B) (emphasis added). The Application Note also provides examples of where the adjustment should apply, including an example where the head of an organization represents that the organization is raising funds to support the organization, but the head of the organization intends to divert a portion of the funds for personal use:

> A defendant, chief of a local fire department, who conducted a public fundraiser representing that the purpose of the fundraiser was to procure sufficient funds for a new fire engine when, in fact, the defendant intended to divert some of the funds for the defendant's personal benefit.

§2B1.1(b)(9)(A), Application Note 7(B)(iii).

The example provided in the Application Note is identical, in all material respects, to Paragraph 12 of the Statement of the Offense, which reads "Throughout the relevant period, Defendant solicited donors to contribute to the Campaign. Defendant never disclosed to potential donors that he had already used a substantial portion of the funds contributed to the Campaign for the personal benefit of him and Co-Conspirator 1, nor did he disclose that he intended to use a substantial portion of any new Campaign contributions for the personal benefit of him and Co-Conspirator 1." Defendant has admitted that he solicited funds for the Campaign;

23

that at the time he solicited funds he intended to use a portion of those funds for his personal use; and that he neither disclosed his past misuse of funds nor his intent to misuse future contributions. The plain language of §2B1.1(b)(9)(A) and its Application Note make clear that the adjustment applies.

This conclusion is further borne out by the applicable case law. In *United States v. Fumo*, 655 F.3d 288 (3rd Cir. 2011), the defendant embezzled funds over a period of time from a charitable organization with which he was affiliated and for which he raised funds. The government argued that the adjustment for misrepresentation should apply, noting that, by the time the defendant acquired for the organization one of its largest contributions during the course of the scheme, the defendant had already embezzled funds for his personal use. The sentencing court refused to apply the adjustment, concluding that the government failed to show that the defendant intended to steal at the time that he solicited the contribution. *Id.* at 314. The Third Circuit held that the sentencing court abused its discretion when it failed to apply the adjustment, noting that "it strains all credulity to believe that [the defendant] repeatedly used [the charitable organization's] funds for personal and political purposes, then withdrew his intent to do so at the time he obtained the $10 million . . ., then regained that intent shortly thereafter as he continued to use [the charitable organization's] funds for his own benefit." *Id.* Here, too, it would strain credulity to argue that over this six-year conspiracy, there was not a single instance of Defendant soliciting funds with the intent of stealing some, or all, of those funds.

Finally, there is an alternate ground on which this adjustment is appropriate. Defendant has admitted that he made misrepresentations to the Campaign in the course of using the Campaign credit card to steal Campaign funds. (Statement of the Offense ¶ 59.) In *United States v. Jefferson*, 182 Fed. App'x 548 (7th Cir. 2006), the defendant, who worked for a

24

charitable organization, solicited funds from another charitable organization and stole a portion of the funds. The sentencing court imposed the misrepresentation adjustment. The Seventh Circuit affirmed the sentencing court's imposition of the misrepresentation adjustment, noting that "[w]e see no reason why it should matter that [the defendant] misrepresented his intentions to an incorporated entity rather than a natural person." *Id.* at 549-50. In the statement of the offense, Defendant admits to a pervasive pattern of using his Campaign credit card to make personal expenditures and then directing the Campaign to use its funds to pay for these expenses, all the while tacitly, and in some instances explicitly, representing that these were legitimate campaign expenditures. On these misrepresentations, alone, §2B1.1(b)(9)(A) should apply.

## Sentencing Recommendation

The government recommends that the Court sentence Defendant to 48 months incarceration, order $750,000 in restitution to the Campaign, impose a forfeiture money judgment in the amount of $750,000, and impose a three-year period of supervised release.

A district court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007) (citation omitted). The Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *id.* at 46, and are the "starting point and the initial benchmark," *id.* at 49. The district court should next consider all of the applicable factors set forth in Title 18, United States Code, Section 3553(a). *Id.* at 49-50. Indeed, the Guidelines themselves are designed to calculate sentences in a way that implements the considerations relevant to sentencing as articulated in Section 3553(a). *Rita v. United States*, 551 U.S. 338, 348-49 (2007).

The Section 3553(a) factors include (1) "the nature and circumstances of the offense and the history and characteristics of the defendant," (2) the need for the sentence imposed to reflect the seriousness of the offense, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed correctional treatment, (3) the Sentencing Guidelines and related Sentencing Commission policy statements, and (4) the need to avoid unwarranted sentence disparities. 18 U.S.C. § 3553(a).

This memorandum proceeds in two parts. First, it discusses the analysis of these § 3553 factors that leads the government to conclude that a sentence of 48 months is appropriate. Second, it analyzes issues of restitution and forfeiture.

## I.   <u>Incarceration</u>

When one views Defendant's history and characteristics, his financial condition at the time of the conspiracy, the nature and circumstances of the offense, the seriousness of the offense, and the need for avoiding unwarranted sentencing disparities, there can be little doubt that a sentence of 48 months is appropriate.

*Defendant's History and Characteristics*

At sentencing, it is important to remember Defendant's history, the advantages he has had in his life, and the resources he had at the very time that he was stealing funds from the Campaign. A review of his history and characteristics shows that Defendant chose to steal hundreds of thousands of dollars despite having advantages in life and financial resources that few possess and that most can only ever dream of obtaining.

**Defendant's History**

Defendant obtained his high school degree from St. Albans School for Boys in Washington, D.C.   PSR ¶ 108.   Upon graduating from this prestigious school, Defendant attended North Carolina A&T University, where he earned his Bachelor of Science/Arts.   PSR ¶ 107.  He later obtained his Juris Doctorate from the University of Illinois.  *Id.*  While attending law school, Defendant married Sandra Stevens.  PSR ¶¶ 89, 107.  Approximately two years after graduating from law school, Defendant was elected to Congress.  PSR ¶ 112.  Approximately three years after being elected to Congress, Defendant and his wife purchased a home in a neighborhood between Georgetown and Dupont Circle.  PSR ¶¶ 93, 112.  The couple's Washington, D.C., home is their second home.  The two also own, lien-free, a home in Chicago, Illinois.  PSR ¶ 124.

**Defendant's Financial Condition at the Time of the Offense**

When Defendant was first elected to Congress in 1995, Members of the House of Representatives earned $133,600.  When Defendant resigned from Congress in 2012, the salary for Members of the House of Representatives had grown to $174,000.  *Salaries*, House Press Gallery, http://housepressgallery.house.gov/member-data/salaries (last visited June 6, 2013).  In 2011, according to census data, any household that earned in excess of $143,611 was in the top 10 percent of household incomes in the country.  Alicia Munnell, *Is $250K a middle-class income?* MarketWatch (Oct. 17, 2012, 1:14 p.m.), http://www.marketwatch.com/story/is-250k-a-middle-class-income-2012-10-17.  As such, even if Defendant's "only" income were his salary as a member of Congress, his household income would fit comfortably inside the top 10 percent of household incomes in the country.

27

Of course, Defendant's salary as a Member of the House of Representatives was not the only income that his household received. On June 8, 2001, Defendant requested that the FEC advise him on whether the Campaign could employ his wife as a consultant. The FEC advised that, so long as a family member was providing "*bona fide* campaign-related services" to a campaign, the campaign could pay the family member the fair market value for the services rendered. Advisory Opinion 2001-10, F.E.C. (July 17, 2001). Apparently relying on this Advisory Opinion, Defendant paid his wife's consulting firm—of which she was the sole employee—$5,000 per month for nearly every month during which this conspiracy to defraud the Campaign occurred (August 2005 through July 2012). According to the Campaign's disclosures with the FEC, this $5,000 per month (or $60,000 per year) salary resulted in Defendant's wife's consulting firm earning $340,500 during the 84 months that this conspiracy lasted. To be clear, this $340,500 that Defendant, according to the Campaign, paid his wife is separate and apart from the $750,000 that Defendant and his wife conspired to steal, and did steal, from the Campaign.[6]

Furthermore, during the life of this Conspiracy, Defendant's wife was elected Alderman of Chicago's Seventh Ward in May 2007. The following table reflects the income that she earned during each of the years she served as an Alderman:

---

[6]    The government has not challenged whether these payments exceeded "fair market value" such that, under AO 2001-10, portions of these payments should have been deemed personal in nature. These payments continued while Defendant was hospitalized in 2012 and up through the date of Defendant's re-election in November 2012, a period during which it has been noted that the Campaign was engaging in no, or at best minimal, campaign activity. *See, e.g.*, Mary Ann Ahern, *Jesse Jackson Jr. Isn't Campaigning, But Expenditures Still Being Made*, NBC Chicago (Oct. 19, 2012, 7:12 a.m.), http://www.nbcchicago.com/blogs/ward-room/jesse-jackson-jr-campaign-expenditures-174867181.html.

| Year | Salary |
|------|--------|
| 2008 | $104,101 |
| 2009 | $110,556 |
| 2010 | $110,556 |
| 2011 | $110,556 |
| 2012 | $114,913 |

Hal Dardick and Joe Germuska, *Chicago Aldermanic Salaries, 2008-2012*, Chicago Tribune (January 30, 2012), http://media.apps.chicagotribune.com/tables/alderman-salaries.html.

Before Defendant or his wife stole a dime, they received substantial incomes. For instance in 2011, their combined income from their salaries and her consulting fees was $344,556. In 2011 that household income would put the Jacksons within the top four percent of household incomes in the country. Phil Izzo, *What Percent Are You?*, Wall St. J. Econ. Blog (Oct. 19, 2011, 6:00 a.m.), http://blogs.wsj.com/economics/2011/10/19/what-percent-are-you/.

Finally, the Jacksons had resources beyond their hundreds of thousands of dollars in income. They were also in the unique position of having friends and family members who were willing to give, or to lend them, tens of thousands of dollars. The Statement of the Offense outlines these payments. For instance, the Statement of the Offense outlines $44,405 in payments the Jacksons received from friends and family in 2011—the same year in which they collectively earned $344,556 in salary and consulting fees.

*The Nature and Circumstances of the Offense*

Despite earning hundreds of thousands of dollars per year *and* having friends and family members to whom the Jacksons could turn for help, the Jacksons conspired to steal money. The

two conspired successfully, stealing approximately $750,000 by engaging in a series of more than 3100 transactions in which they unlawfully used Campaign funds to make personal purchases. The categories of goods that Defendant purchased using Campaign funds truly ran the gamut. Defendant used Campaign funds to meet the typical categories of expenses that a family of four might incur, including groceries, movie tickets, dry cleaning, eating out, and drug-store expenses—expenses Defendant should easily have been able to satisfy relying on his and his wife's hundreds of thousands of dollars of income. But Defendant also used Campaign funds to purchase expensive collector's items, including sports and political memorabilia, porcelain figures, electronic goods, and memorabilia from the entertainment industry—items neither he, nor his family, truly needed.

Defendant succinctly stated during his plea colloquy, "[f]or years I lived off my campaign." Michael S. Schmidt, *Jesse Jackson Jr. Pleads Guilty: 'I lived off My Campaign'*, The New York Times (Feb. 20, 2013), http://www.nytimes.com/2013/02/21/us/politics/jesse-l-jackson-jr-pleads-guilty-to-wire-and-mail-fraud.html. Defendant's admission is indisputably true. But, from the government's perspective, the admission lacks a key piece of context: Defendant lived off his Campaign for years, *even though there was no need for him to do so*. Defendant and his wife had the resources to meet their family's needs. This offense does not involve a situation where a family's income was cut or an unexpected expense was incurred, and an individual, faced with the pressure of not being able to make ends meet, made a criminal choice. This offense, at its core, is about greed and entitlement: Defendant wanting more than even his substantial resources could afford him and believing he was entitled to both the items he desired and Campaign funds to purchase those items.

For much of the relevant period, Defendant used his Campaign credit card to purchase these personal items. In late 2008 and early 2009, Defendant began using different tactics to steal Campaign funds. These new tactics make this conduct even worse: i) the timing of these new tactics evidences a flagrant disregard for the law; and ii) the new tactics involved Defendant using people, beyond his wife, to accomplish his criminal objectives.

### Defendant's Conduct Shows a Flagrant Disregard for the Law

With respect to the timing of these new tactics, it is important to understand what else was occurring in Defendant's life at the time that Defendant chose to employ these new tactics. On December 9, 2008, former Governor of Illinois Rod Blagojevich was arrested in connection with a scheme to personally profit from filling the Senate seat in Illinois that was opened by then-President Elect Barack Obama's election. Jeff Coen and John Chase, *Rep. Jesse Jackson Jr.: Feds Step Up Inquiry*, Chicago Tribune (Apr. 9, 2009), http://articles.chicagotribune.com/2009-04-09/news/0904080858_1_jackson-senate-seat-congressional-ethics. Details of the sworn affidavit in support of Blagojevich's arrest were widely reported, including the fact that Blagojevich, in a conversation that was covertly recorded, stated that a representative of "Senate Candidate No. 5" offered to raise $1.5 million in campaign contributions for Blagojevich if Blagojevich nominated Defendant to fill the vacancy. Adam Goldman and Richard T. Pienciak, *Jesse Jackson Jr. Allies Held Blagojevich Fundraiser Last Week*, The Huffington Post (December 12, 2008, 9:49 p.m.), http://www.huffingtonpost.com/2008/12/12/jesse-jackson-jr-allies-h_n_150493.html. Based on other details in the affidavit, suspicions immediately arose that Defendant was Senate Candidate No. 5 and, on December 10, 2008, Defendant's then-counsel confirmed that Defendant was, in fact, Senate Candidate No. 5. Brian Ross, *Rep. Jesse Jackson Jr. Is 'Senate Candidate No. 5'*,

31

*Says   He   Did   Nothing   Wrong*,   ABC,   The   Blotter   (Dec.   10,   2008), http://abcnews.go.com/Blotter/ConductUnbecoming/story?id=6431739&page=1.   Defendant held a press conference the afternoon of December 10, 2008, in which he told the media that federal prosecutors had asked to speak with him about the events surrounding the vacant Senate seat, and the media quoted Defendant as stating: "I reject and denounce pay-to-play politics and *have no involvement whatsoever in any wrongdoing*." *Id.* (emphasis added).  It is worth noting that at the time that Defendant made this sweeping assertion about having no involvement in any wrongdoing, he had already stolen hundreds of thousands of dollars from the Campaign.

Over the coming months, the scrutiny of Defendant increased.  On March 27, 2009, Defendant was interviewed by the FBI.  On April 9, 2009, it was publically reported that a Congressional Ethics Panel was investigating Defendant's actions and that federal grand jury subpoenas had been sent to individuals who might have knowledge about fundraising efforts that an individual affiliated with Defendant might have made for Blagojevich.  Jeff Coen and John Chase, *Rep. Jesse Jackson Jr.: Feds Step Up Inquiry*, Chicago Tribune (Apr. 9, 2009), http://articles.chicagotribune.com/2009-04-09/news/0904080858_1_jackson-senate-seat-congressional-ethics.

Against this backdrop, Defendant decided to double down on his criminal conduct.  As is set forth in the Statement of the Offense, Defendant's primary method for stealing Campaign funds, until early 2009, was directly paying for personal expenditures through the Campaign— either making charges on the Campaign credit card or paying for expenses directly from a Campaign account.  There were a handful of instances in October 2008 where Defendant funneled Campaign funds through Person A, so that Person A could pay personal expenses on Defendant's behalf.  But this pattern of Defendant funneling Campaign funds through others so

that they could pay for expenditures on his behalf did not begin, in earnest, until March 2009—the very month that Defendant was interviewed by the FBI.

Getting embroiled in the Blagojevich investigation did not make Defendant stop stealing. Instead, his reaction was to devise new ways of stealing from the Campaign. Defendant's audacious decision evidences a complete lack of respect for the law. When one looks at this chronology, one must conclude that Defendant believed that the law did not apply to him or that he was above the law. This flagrant disregard for the law is an aspect of Defendant's conduct that the Court should take into consideration at sentencing.

### Implicating Others in His Criminal Conduct

In addition to evidencing a complete lack of respect for the law, there is one other aspect of these changed tactics that the Court should take into consideration when assessing the circumstances of Defendant's offense: by funneling Campaign funds through others, Defendant implicated others in his criminal conduct. To be clear, the only two people whom the government has charged with criminal acts are Defendant and his wife. But Defendant involved a number of individuals in transactions that were either illegal or, at a minimum, raise the appearance of impropriety. Defendant gave Person A stolen funds to spend on his behalf; failed to report funds provided to him by Persons E and F; and had Persons C and D engage in cash transactions, involving large sums of money, on his behalf. Defendant made each of these people a necessary component of the crimes he committed, and, as a result of his decisions, each of these people is mentioned by pseudonym in a federal charging document. A number of these people worked for Defendant's Congressional office, depended on him for their livelihood, and acted at his direction in these transactions. Others were long-time acquaintances who gave funds to Defendant, as he was "struggling" to survive on a household income that 96 percent of

Americans would have gladly traded for their own. Until finally accepting responsibility for his criminal conduct as part of this plea agreement, Defendant showed no regard for these individuals as he entangled them in his web of crimes.

*     *     *     *

In sum, Defendant's theft of approximately $750,000 is an offense that was driven by greed and entitlement. During this multi-year conspiracy he evidenced a complete disrespect for the law and a disregard for the people he used in furtherance of this conspiracy.

*Seriousness of the Offense; Punishment; and Deterrence*

The seriousness of this offense cannot be overstated. While stealing from the Campaign certainly had serious consequences for the Campaign, the even greater concern is the effect that Defendant's conduct could have on political contributions and the campaign system as a whole. The last election cycle saw record donations, with an estimated $7 billion of campaign contributions spent by, or on behalf of, federal candidates. Andy Kroll, *The 2012 Election's Price Tag: $7 Billion*, Mother Jones (Feb. 1, 2013, 1:48 p.m.), http://www.motherjones.com/mojo/2013/02/2012-election-cost-7-billion-obama-romney. An estimated $3.2 billion of that amount was spent directly by candidates. *Id.*

Defendant's illegal use of approximately $750,000 contributed to the Campaign undermines the integrity of the system and threatens to engender the type of cynicism that might cause someone who would otherwise contribute to a campaign or campaigns, not to contribute. Put another way, Defendant's conduct has the potential to deter individuals from participating in the political process. As such, the sentence the Court imposes should seek to: 1) deter others from engaging in similar conduct that might further undermine the integrity of the system; and 2) provide confidence in the system, such that those who would otherwise consider contributing

34

to campaigns will not be chilled by concerns that candidates will use campaign funds for personal expenses.

*Sentencing Guidelines and Unwarranted Sentence Disparities*

Consistent with the nature and circumstances of this offense and its seriousness, Defendant's offense level calls for a significant period of incarceration. When one compares the government's recommended sentence to the sentences imposed on others who stole from their campaigns, it becomes clear that Defendant's range is at the low end of sentences others received, once one controls for the amount stolen in each of these cases:

- *United States v. Pawlinski*, 374 F.3d 536 (7th Cir. 2004) – A Milwaukee Alderman pleaded guilty to stealing approximately $40,000 from his campaign for personal use. He was sentenced to 8 months incarceration (approximately 2 months per $10,000 stolen).

- *United States v. Henningsen*, 387 F.3d 585, 588 (7th Cir. 2005) – A Milwaukee Alderman was convicted at trial of stealing approximately $31,000 from his campaign for personal use. He was sentenced to 33 months (approximately 10 months per $10,000 stolen).

- *United States v. Taff*, 400 F. Supp. 2d 1270, 1271-72 (D. Kan. 2005) – A candidate for the U.S. House of Representatives pleaded guilty to using $300,000 of campaign funds to purchase a bank check to use as proof of a down payment for a home purchase. The candidate immediately returned the funds to his campaign after showing the bank check to a realtor (the funds were missing from the campaign for less than an hour). He was sentenced to 15 months (approximately 0.5 months per $10,000 stolen).

The government's recommended sentence would be approximately 0.64 months per $10,000 stolen. While it is helpful to review similar cases and compare sentences by controlling for the amount stolen, sentences in these cases turn on more than a formulaic calculation of the amount stolen. Two of these individuals accepted responsibility and one did not. It is clear that the two who accepted responsibility had significantly shorter periods of incarceration, when one controls for amount stolen, than the one who did not. Acceptance of responsibility and

cooperation are Defendant's greatest mitigating factors, from the government's perspective, and they are what warrant Defendant receiving a sentence at the low end of this range, once one controls for the amount of money stolen.

In the fall of last year, Defendant's counsel asked to meet with our Office. At the meeting, Defendant's counsel informed us that they were aware that our Office was investigating Defendant's misuse of Campaign funds and that Defendant wanted to work with our Office to resolve the investigation. Our Office ultimately informed counsel for Defendant that we had documented hundreds of thousands of dollars in illegal expenditures and that thousands of transactions remained under investigation. Defendant and his counsel worked with our Office to complete the remaining portion of the investigation, conceding that numerous expenditures were personal in nature and providing support for the few transactions under investigation that were, in fact, campaign-related. As a result of this process, the government was able to finish in weeks what otherwise might have taken months. Therefore, Defendant, through his cooperation, not only saved the government the expense of a trial, but he also saved the government the expense of conducting the tail-end of its investigation into Defendant's misconduct. And he offered this cooperation prior to law enforcement approaching him.

Defendant was contrite throughout the process. Moreover, while failing to think about the impact of his crimes on others at the time he committed these crimes, he was acutely aware of these individuals during his period of cooperation, repeatedly stating, through his counsel, that he was fully responsible for the crimes that occurred.

Defendant deserves substantial credit for his acceptance of responsibility and his unusual level of cooperation with the investigation of his criminal conduct. The government submits, though, that Defendant already received that significant consideration based on how the plea

agreement was structured. Defendant could have been charged with other crimes that would have resulted in a higher offense level. The government did not incorporate those charges into Defendant's plea agreement in light of his cooperation, attitude towards the investigation, prompt resolution of the case, and saving the government not only the expense of trial, but the expense of completing its investigation. The fact that Defendant's plea already reflects the credit he should receive for his cooperation is corroborated by the fact that Defendant's applicable Guideline range falls on the low end of the spectrum of sentences reported above, when one controls for the amount stolen. As such, we do not believe the Court needs to go below the applicable Guideline range in order to recognize Defendant's cooperation.

*The Government Recommends that the Court Stagger the Periods of Incarceration for Defendant and His Wife*

The government submits that the Court should structure Defendant's and his wife's sentences so that they are not simultaneously incarcerated. The United States Sentencing Guidelines make clear that "family ties and responsibilities are not ordinarily relevant in determining whether a departure may be warranted," U.S.S.G. §5H1.6 (2012), though courts can depart on these grounds when the impact that incarceration will have on a particular family substantially exceeds the typical impact of incarceration that a family might suffer. *See, e.g., United States v. Johnson*, 964 F.2d 124 (2nd Cir. 1992). Several courts have considered whether having both parents incarcerated warrants departing under this provision and have concluded that it does not. *See, e.g., United States v. Thi*, 692 F.3d 571, 573-74 (7th Cir. 2012) (affirming a sentencing court's decision not to depart under §5H1.6, where, as a result of both parents' convictions for fraud-related charges, the defendant's three-year-old daughter was going to have to be relocated to a different part of the country to live with a grandmother who spoke little

English and was from a different cultural background); *United States v. Gary*, 613 F.3d 706, 710-11 (7th Cir. 2010) (affirming a sentencing court's decision not to depart under §5H1.6, where both parents were sentenced to periods of incarceration for their respective roles in a fraud scheme); *United States v. Bieri*, 21 F.3d 811, 818 (8th Cir. 1994) (affirming a sentencing court's decision not to depart under §5H1.6, where the defendants, parents of young children, were each sentenced to over four years of incarceration).

However, even though, a departure is not warranted, the government submits that—based on the unique circumstances of this case—the Court should account for the impact incarceration will have on Defendant's family when structuring his sentence. The *Gary* case provides guidance on the type of accommodation the government believes is warranted. In affirming the sentencing court's denial of a §5H1.6 departure, the *Gary* court noted that the sentencing judge considered the impact of both parents being incarcerated and that "[h]e did all he could to ensure that the two parents would serve their prison terms in sequence so that one would always be available to care for the children." *Gary*, 613 F.3d at 710.

The government recommends that this Court give the same consideration to Defendant that was provided in *Gary*. In general, it would be appropriate for the Court to consider the impact of both parents being incarcerated at the same time, but it would be particularly appropriate to do so here, given the relatively minimal impact that the accommodation would have on the imprisonment schedule and the facts of these cases. With respect to impact on the imprisonment schedule, the government is requesting that the Court order that Defendant's wife be imprisoned on the same schedule as any other defendant. The government is recommending that Defendant's wife be sentenced to a period of 18 months of incarceration. With credit for satisfactory behavior and statutorily required pre-release custody, it is possible that if

Defendant's wife is sentenced to 18 months, she will be back with her children, on home confinement, a little more than a year after the date of her surrender.   18 U.S.C. § 3624(a), (b), (c).  The accommodation the government recommends is that Defendant not be required to surrender until his wife is in prerelease custody (assuming the requirements of prerelease custody are satisfied by home confinement) or until his wife is released from custody (assuming prerelease custody is satisfied through a method of detention other than home confinement).   Even with this delayed surrender date, Defendant will be incarcerated sooner than he would have been had he not proactively cooperated in his own investigation and pleaded guilty.  There is no doubt that it could have taken well in excess of a year for the government to complete its investigation on its own, secure a conviction at trial, and complete the sentencing proceedings.  Where the potential for harm to Defendant's family is real, modestly delaying Defendant's surrender date is an appropriate way of recognizing Defendant's cooperation and acceptance of responsibility.

## II.   **Financial Components of Defendant's Sentence**

*Restitution*

The Mandatory Crime Victim's Rights Act (MCVRA), at 18 U.S.C. § 3663A, requires courts to compel a defendant convicted of a Title 18 offense against property, "including any offense committed by fraud or deceit[,]" 18 U.S.C. § 3663A(c)(1)(A)(ii), to make restitution to a victim of the offense. "[T]he term 'victim' means a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." 18 U.S.C. § 3663A(a)(2). If a victim is incompetent or incapacitated the

court may appoint a person suitable to the court to "assume the victim's rights under this section[.]" *Id.*

In this case, the Campaign is the victim of Defendant's criminal offense because Defendant stole funds from it. As is further discussed below, because the Campaign never functioned as an entity independent from Defendant, and because its current treasurer of record is the very same person who was treasurer during much of the period of the conspiracy, this Court should find that the Campaign is incompetent and appoint a suitable person to assume the Campaign's rights as a victim of Defendant's offense.

Although Defendant has resigned from Congress and is not seeking re-election, the Campaign, like any other principal campaign committee, must be wound down. Under federal law, the residual funds that campaigns possess can go to a number of different entities, including charitable organizations; national, state, and local party committees; and state and local candidates. 2 U.S.C. § 439a; 11 C.F.R. § 113.2. Thus, restitution to the Campaign would return the funds that Defendant and his wife wrongfully obtained from the Campaign, so that those funds can be distributed in accordance with federal law along with the Campaign's remaining residual funds.

Despite the Campaign's status as a victim under the MCVRA, it would be inappropriate here to order restitution to the Campaign as it currently exists. The Campaign never functioned as the independent entity envisioned under campaign finance law. Under federal law, each candidate for federal office, except for nominees for the office of the Vice President, must form a principal campaign committee. 2 U.S.C. § 432(e)(1); 11 C.F.R. § 101.1(a). Once designated, a principal campaign committee can establish and utilize bank accounts for the purpose of managing the finances of the campaign. 2 U.S.C. § 432(h)(1). A treasurer must be appointed for

40

the committee. 2 U.S.C. § 432(a); 11 C.F.R. § 102.7(a). Without a treasurer, a committee cannot accept contributions or make expenditures, and no expenditure can be made by a committee unless a treasurer authorizes it. 2 U.S.C. § 432(a); 11 C.F.R. § 102.7(b). The treasurer is responsible for filing the committee's financial disclosures and the accuracy of the disclosures. 11 C.F.R. §§ 104.1(a), 104.5(a), and 104.14(d). The logic of the structure is that the treasurer is to serve as a check, ensuring that a campaign is not merely an extension of the candidate and that a campaign's resources are spent on permissible purposes.

Here, Defendant structured his Campaign to ensure that it never obtained any level of independence from him. Defendant's Campaign had three treasurers during the life of the conspiracy. The first treasurer was his co-conspirator, Ms. Jackson. Before stepping aside, Ms. Jackson trained Person A to be the treasurer. As Defendant admitted in the Statement of the Offense, Defendant and his wife, on numerous occasions, directed Person A not to itemize the personal expenditures made on the Campaign credit cards, which resulted in the failure to report personal expenditures on the Campaign credit cards that should have been reported. Despite ultimately stepping aside as treasurer, Person A continued to prepare the Campaign's FEC submissions; Person B would simply sign the forms after Person A prepared them. Person B, treasurer during much of the period of the conspiracy, and still on record as the Campaign treasurer, presumably will oversee the wind down, and would be the person responsible for allocating funds returned to the Campaign through restitution if the Court were to order restitution without appointing a monitor to assume the rights of the Campaign as the victim of Defendant's offense.

Factors such as those above led a court in this jurisdiction to hold that a victim non-profit corporation should not receive restitution. In *United States v. Emor*, 850 F. Supp. 2d 176

41

(D.D.C. 2012), the defendant, who had founded and run a school for special needs students, was convicted of stealing funds from the school for his personal use. *Id.* at 179-81. Although the school had a nominal Board of Directors and a bookkeeper who was responsible for ensuring that the school's funds were used only for permissible purposes, the Board and the bookkeeper never questioned defendant about his flagrant abuses of the school's funds, nor did they make any effort to stop the defendant from stealing funds. *Id.* at 184-185, 199-200. The court concluded its findings of facts by noting: "The evidence is unmistakable that during the period of the fraud scheme [the defendant] controlled every facet of [the school] and its finances, including the decisions made by its Board of Directors." *Id. at* 200. The court concluded that two bases existed for not providing the school restitution.

First, the court concluded that the law allows for ignoring corporate structure where the corporation is merely the "alter ego" of its owner, and that this principal applies even where the corporation is a non-profit corporation. 850 F. Supp. 2d at 205-06. It noted that "[c]ourts must assess a variety of factors besides domination of the organization by a single individual— including a failure to maintain corporate minutes or adequate corporate records, commingling of funds and other assets of the corporation, and diversion of the corporation's funds or assets to non-corporate uses such as personal use by the corporation's shareholders or the dominant, controlling person." *Id.* at 208. The court concluded after analyzing a number of factors that the school was simply the defendant's alter ego and that ordering defendant to pay restitution to it would be improper. *Id.* The factors the court cited in reaching this conclusion include the following:

- The defendant possessed unchecked authority to use the school's funds;

42

- The defendant "treated [the school's] bank accounts as his own, routinely paying for purchases large and small with a debit/credit card that drew directly from those funds"; and

- Individuals involved with the school helped to facilitate the fraud.

*Id.*

Second, the court in *Emor* concluded that to the extent the school had any independence from the defendant, the school should be treated as a co-conspirator. The court noted that "a number of courts have held that a party who participated in the defendant's offense cannot be considered a 'victim[,]'" 850 F. Supp. 2d at 209, and it analyzed a number of cases in which courts applied a "co-conspirator" exception when denying restitution payments, *see id.* at 209-10. "The relevant inquiry [for when the co-conspirator exception applies] is whether the ostensible victim was a knowing participant in the very offense for which the defendant was ordered to pay restitution, sharing the goals of the defendant." *Id.* at 210. The court concluded that the standard was met in *Emor*, citing the fact that the defendant did not hide the illegal conduct from the school and the fact that employees of the school helped to facilitate the defendant's crimes.

To be sure, *Emor* could provide justification for simply declining to order Defendant to pay restitution to the Campaign in this case. But there is a critical difference between the non-profit corporation in *Emor* and the Campaign. The Campaign is not a going concern that could continue to function and whose existence might be ensured by a massive infusion of cash in the form of a restitution payment. The Campaign must be wound down and there is clear statutory guidance on the acceptable methods for winding it down. The Campaign needs a reliable monitor to execute the wind down. But it currently lacks such a leader. Defendant, who as the candidate had primary decision-making authority with respect to the Campaign, should no longer

43

have any role with the Campaign. The lack of leadership has recently manifested itself with the Campaign missing filings required by law. Katherine Skiba, *No Sign of Reports Jackson Is Required to File*, Chicago Tribune News (May 8, 2013), http://articles.chicagotribune.com/2013-05-08/news/ct-met-jesse-jackson-jr-filings-0507-20130508_1_jackson-fec-house-ethics-committee. The best way for the Court to ensure that the Campaign is properly wound down and that all the funds contributed to the Campaign—including the stolen $750,000—are distributed in a lawful manner, is for the Court to order restitution and appoint a monitor to ensure a proper wind down.

*The Court Should Finalize the Forfeiture Money Judgment of $750,000*

On February 20, 2013, the Honorable Robert L. Wilkins entered a preliminary Consent Order of Forfeiture. The government requests that the Court enter a final order of forfeiture at the time of Defendant's sentencing.

44

## Conclusion

In light of the § 3553(a) factors, the United States respectfully recommends that this Court sentence Defendant to 48 months of incarceration, order $750,000 in restitution to the Campaign, impose a forfeiture money judgment in the amount of $750,000, and impose a three-year period of supervised release.

Respectfully submitted,

RONALD C. MACHEN JR.
UNITED STATES ATTORNEY
D.C. Bar No. 447-889
/s/

_____

Matt Graves
Michael Atkinson
DC Bar No. 481052 (Graves)
DC Bar No. 430517 (Atkinson)
Assistant United States Attorney
555 4th Street, N.W.
Washington, D.C.  20530

45